Kendra Johnsen and Jamie Koch, individually
and on behalf of all others similarly situated,
appellants, and Jamie Longwell, appellee,
v. State of Nebraska et al., appellees.
697 N.W.2d 237

Filed May 13, 2005.   No. S-03-1319.

Rebecca L. Gould, of Nebraska Appleseed Center for Law in the Public Interest, Welfare Due Process Project, for appellants.

Jon Bruning, Attorney General, Royce N. Harper, and Mike Rumbaugh, Special Assistant Attorney General, for appellees.

Hendry, C.J., Wright, Connolly, Gerrard, Stephan, McCormack, and Miller-Lerman, JJ.

Connolly, J.

Neb. Rev. Stat. §§ 68-1202 to 68-1210 (Reissue 2003) allow the State to subsidize certain social services, including child-care. Acting under the auspices of these statutes, the Nebraska Department of Health and Human Services (DHHS) has created the "Child Care Subsidy Program." In 2002, DHHS adopted new regulations that would require that a family have income of less than 120 percent of the federal poverty level to be eligible for the Child Care Subsidy Program. The new regulations superseded regulations that had set the income eligibility level for the Child Care Subsidy Program at 185 percent of the federal poverty level.

The appellants, Kendra Johnsen and Jamie Koch, represent a class of persons whose income is between 120 and 185 percent of the federal poverty level and who lost the benefits they were receiving because of the new income eligibility level. They contend that the new regulation violates the principle of separation of powers found in Neb. Const. art. II, § 1, because it conflicts with an income eligibility level adopted by the Legislature. In

addition, Johnsen argues that DHHS violated her due process rights by notifying her before the new regulation went into effect that the new regulation would result in her losing benefits. We are not persuaded by either argument and affirm the district court's judgment.

## I. BACKGROUND

For persons who are ineligible for the aid to dependent children program (ADC), there are two childcare assistance options in Nebraska. The first is transitional childcare, which provides childcare assistance to families who have previously received cash assistance under ADC, but are no longer eligible for ADC. Families can receive childcare assistance for up to 24 months after they have stopped receiving ADC if the family's income is at or below 185 percent of the federal poverty level. Neb. Rev. Stat. § 68-1724(1)(c) (Reissue 2003).

The second childcare assistance option and the one at issue is the Child Care Subsidy Program. The Child Care Subsidy Program, as implemented by DHHS regulations, provides childcare assistance to low-income families who either have never received ADC benefits or have not received ADC benefits within the last 24 months.

No statute expressly creates the Child Care Subsidy Program. But according to the parties, it is authorized by §§ 68-1202 to 68-1210. Section 68-1202 provides that social services, including childcare,

> may be provided on behalf of recipients with payments for such social services made directly to vendors. Social services shall include those mandatory and optional services to former, present, or potential social services recipients provided for under the federal Social Security Act, as amended, and described by the State of Nebraska in the approved State Plan for Services.

Section 68-1204 authorizes DHHS to "adopt and promulgate rules and regulations, enter into agreements, and adopt fee schedules with regard to social services described in section 68-1202."

In 1998, DHHS adopted 474 Neb. Admin. Code, ch. 7, § 002.01B2 (1998), which set the income eligibility limit for the Child Care Subsidy Program at 185 percent of the federal poverty

level, the same level that § 68-1724(1)(c) sets for transitional childcare. Under both options, the amount of aid an individual family received was set by a sliding scale. The closer a family was to the income eligibility limit, the less aid they received. See, § 68-1724(1)(c); 474 Neb. Admin. Code, ch. 7, § 002.02B (2000).

Here, the dispute found its impetus in 2002 Neb. Laws, L.B. 1309, an appropriations bill meant to address a shortfall in the 2001 budget. Section 74 of L.B. 1309 contained budget appropriations for DHHS program No. 347. Program No. 347 included the Child Care Subsidy Program, as well as a wide array of other public assistance programs. As initially presented to the Governor, L.B. 1309 provided enough funding in program No. 347 so that the income eligibility level for the Child Care Subsidy Program could remain at 185 percent of the federal poverty level.

The Governor, however, returned L.B. 1309 with several line-item vetoes. To notify the Legislature of his line-item vetoes, the Governor sent a letter and an attachment. The attachment included what the Governor referred to as "individual vetoes." One of these "individual vetoes" listed program No. 347 and gave the following description: "Return non-ADC child care subsidy eligibility to 120% FPL [federal poverty level]." The Legislature did not override the Governor's veto of funding for program No. 347.

After the Legislature failed to override the Governor's line-item veto, DHHS drafted new regulations for the Child Care Subsidy Program, one of which, 392 Neb. Admin. Code, ch. 3, § 004.01D (2002), reduced the income eligibility level for the program from 185 percent of the federal poverty level to 120 percent of the federal poverty level. The regulations were adopted and filed with the Secretary of State on June 12, 2002.

Over the course of the following week, DHHS caseworkers sent letters to those who would no longer be eligible for the Child Care Subsidy Program because of the new regulations. These notices informed the recipients that the changes would go into effect on July 1, 2002.

On June 26, 2002, Johnsen and Koch, individually and on behalf of all others similarly situated, filed a petition for injunctive and declaratory relief in Lancaster County District Court. They initially alleged seven causes of action, but they later dismissed five of those causes of action. In the first of their remaining causes

of action, the appellants alleged that by adopting 392 Neb. Admin. Code, ch. 3, § 004.01D, DHHS had violated the principle of separation of powers by exceeding the rulemaking authority granted to it by the Legislature. In the second, they alleged that by sending out termination-of-benefits notices before the effective date of § 004.01D, DHHS had violated their due process rights. The appellants requested that the court certify the action as a class action and declare § 004.01D unconstitutional and enjoin its enforcement.

After the court certified the action as a class action, both the appellants and the State moved for summary judgment. The court entered summary judgment for the State on both of the appellants' causes of action.

## II. ASSIGNMENTS OF ERROR

The appellants assign that the district court erred in holding that (1) the director of DHHS can determine income eligibility requirements for the Child Care Subsidy Program and (2) the class members' due process rights were not violated when notices were sent to them before the effective date of 392 Neb. Admin. Code, ch. 3, § 004.01D.

## III. STANDARD OF REVIEW

■ On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *State v. Contreras*, 268 Neb. 797, 688 N.W.2d 580 (2004).

## IV. ANALYSIS

### 1. SEPARATION OF POWERS

The appellants first argue that 392 Neb. Admin. Code, ch. 3, § 004.01D, violates the constitutional principle of separation of powers. Neb. Const. art. II, § 1, provides, "The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons being one of these departments, shall exercise any power properly belonging to either of the others, except as hereinafter expressly directed or permitted."

The appellants' separation of powers argument has been a moving target throughout this litigation. Initially, they seemed to

argue that the Legislature had not properly delegated the authority to DHHS to set income eligibility for the Child Care Subsidy Program. This argument appeared to be based on the rule that the "Legislature may enact statutes to set forth the law, but it may not delegate that function to the executive or judicial branches of government." *Clemens v. Harvey*, 247 Neb. 77, 82, 525 N.W.2d 185, 189 (1994). In other words, the appellants were claiming that the Legislature had attempted to delegate to DHHS the authority to set eligibility for the Child Care Subsidy Program, but that this delegation was invalid because it would have ceded the Legislature's constitutional power to the executive branch. If we accepted this argument, however, it would mean not only that the regulation setting income eligibility at 120 percent of the federal poverty level was unconstitutional, but that no valid income eligibility rule existed for the Child Care Subsidy Program. Under such a ruling, the entire program would collapse.

Apparently realizing that a court order causing the collapse of the Child Care Subsidy Program would do little to advance their cause, the appellants recast their argument. Before this court and the district court, they have argued that the Legislature has set an income eligibility level for the Child Care Subsidy Program and that by adopting a different, lower eligibility level, DHHS acted outside its rulemaking authority. See *Capitol City Telephone v. Nebraska Dept. of Rev.*, 264 Neb. 515, 528, 650 N.W.2d 467, 478 (2002) ("administrative agency cannot use its rulemaking power to modify, alter, or enlarge provisions of a statute which it is charged with administering"). It is this argument that we consider. It is, however, a murky and complex argument, and to understand it, we need to cut through the thicket of the federal scheme that funds the Child Care Subsidy Program.

(a) Federal Law Providing Funding for
Child Care Subsidy Program

In 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), Pub. L. No. 104-193, 110 Stat. 2105 (1996). PRWORA made significant changes to federal oversight and funding of public assistance programs, including childcare programs. Before PRWORA, the states received funding for childcare programs primarily from

the following four sources: (1) Part of the federal Social Security Act guaranteed childcare assistance to families participating in the aid to families with dependent children program (AFDC); (2) another part of the federal Social Security Act guaranteed childcare assistance to families transitioning off AFDC; (3) a third part of the federal Social Security Act granted funds to the states to create programs to assist working parents not eligible for AFDC, but at risk of becoming dependent upon AFDC; and (4) the Child Care and Development Block Grant Act of 1990 (CCDBGA) provided childcare assistance to low-income families who were working or in education or training programs. See, generally, Jo Ann C. Gong, *Child Care in the Wake of the Federal Welfare Act*, 30 Clearinghouse Rev. 1044 (1997).

The childcare provisions of the PRWORA were meant to streamline what was considered to be a confusing system. See *id*. States now receive most of their federal funding for childcare assistance out of the childcare and development fund. This fund is created out of three primary funding streams. The first stream is set out at 42 U.S.C. § 618(a)(1) (2000), part of subchapter IV of the Social Security Act. The second stream is found at 42 U.S.C. § 9858 (2000), part of the CCDBGA. The third stream is set out at 42 U.S.C. § 618(a)(2), also part of subchapter IV of the Social Security Act. In addition to these three funding streams, states have the option of diverting 30 percent of the funds they receive under the temporary assistance for needy families program, which supplanted AFDC, to the childcare and development fund. See 42 U.S.C. § 604(d)(1)(B) (2000). See, also, Gong, *supra*.

As noted, these funding streams flow into the childcare and development fund, which is governed by the CCDBGA. So, although the funding streams originate in different places, once they flow into the childcare and development fund, they are subject to the "requirements and limitations of [the CCDBGA]." 42 U.S.C. § 618(c).

The CCDBGA contains many limitations and requirements, but for the purposes of this case, the pertinent limitation is 42 U.S.C. § 9858n(4) (2000). It defines an eligible child as one:

(A) who is less than 13 years of age;

(B) *whose family income does not exceed 85 percent of the State median income for a family of the same size*; and

(C) who—

(i) resides with a parent or parents who are working or attending a job training or educational program; or

(ii) is receiving, or needs to receive, protective services and resides with a parent or parents not described in clause (i).

(Emphasis supplied.) This provision, however, does not require that states make aid available to all children who meet the definition of "eligible child." This is made clear by 42 U.S.C. § 9858d(a) (2000), which states, "Nothing in this subchapter shall be construed . . . (2) to limit the right of any State to impose additional limitations or conditions on contracts or grants funded under this subchapter."

Therefore, the definition of "eligible child" in 42 U.S.C. § 9858n(4) acts as a cap; it prevents the states from providing aid to children whose family income exceeds 85 percent of the state median income for a family of the same size. For example, a state could limit aid to children whose family income does not exceed 40 percent of the state median income, but the state could not provide aid to a child whose family income is 95 percent of the state median income for a family of the same size.

(b) Appellants' Argument

Nothing in §§ 68-1202 to 68-1210 expressly sets out an income eligibility level for the Child Care Subsidy Program. But § 68-1204 states in part, "For the purpose of providing or purchasing [childcare] the state hereby accepts and assents to all applicable provisions of the federal Social Security Act, as amended." The appellants claim this language incorporates by reference the CCDBGA. The appellants then focus on the definition of "eligible child" in 42 U.S.C. § 9858h(4) of the CCDBGA. As previously discussed, this statute states in part that an eligible child is someone whose family income does not exceed 85 percent of the state's median income for a family of the same size, an amount that, according to the parties, is roughly 270 percent of the federal poverty level. The appellants acknowledge that this definition acts as a cap on income eligibility. But, they argue that because the Legislature has not expressly adopted a lower income eligibility level, it must have intended that the

CCDBGA's definition of eligible child govern the income eligibility limit for the Child Care Subsidy Program.

In other words, according to the appellants, the Legislature, by incorporating the CCDBGA, has mandated that the income eligibility level for the Child Care Subsidy Program be 85 percent of the state median income (i.e., roughly 270 percent of federal poverty level) and that DHHS has no authority to set a lower income eligibility level. Thus, DHHS' decision to set income eligibility at 120 percent of the federal poverty level ran afoul of a direct legislative command and therefore violates the principle of separation of powers. The appellants further point out that if we were to accept their argument, it would mean that the predecessor to 392 Neb. Admin. Code, ch. 3, § 004.01D, which set the income eligibility level at 185 percent of the federal poverty level, was also unconstitutional.

### (c) Resolution

Initially, we are skeptical that § 68-1204 incorporates the CCDBGA. A statute may adopt all or a part of another statute by a specific reference, and the effect is the same as if the statute or part thereof adopted had been written into the adopting statute. *Clemens v. Harvey*, 247 Neb. 77, 525 N.W.2d 185 (1994). Section 68-1204 states that the State of Nebraska "accepts and assents to all applicable provisions of the federal Social Security Act." Both DHHS and the appellants assume that the CCDBGA is part of the federal Social Security Act. The federal Social Security Act, however, consists of 21 subchapters. See 42 U.S.C. §§ 301 to 1397jj (2000 & Supp. I 2001). The CCDBGA is codified at 42 U.S.C. §§ 9858 to 9858q (2000). Thus, although the CCDBGA operates in conjunction with the federal Social Security Act, it is not actually part of that act.

We, however, need not definitively decide whether § 68-1204 incorporates the CCDBGA. Even if we assume that it does, the appellants draw the incorrect inference from that incorporation. The incorporation would mean that Nebraska has "accepted and assented" to the requirements and limitations imposed by the CCDBGA, therefore limiting the ability of DHHS to adopt regulations that contravene the CCDBGA. One of the requirements of the CCDBGA is that states not provide federal aid to children

whose family income is greater than 85 percent of the state median income for families of the same size (i.e., roughly 270 percent of the federal poverty level). Thus, § 68-1204, if it does in fact incorporate the CCDBGA, would prevent DHHS from adopting regulations that set an income eligibility level above 85 percent of the state median income for families of the same size. DHHS would remain free, however, to adopt regulations that, like the ones here, set the income eligibility level below 85 percent of the state median income level for a family of the same size. So, even if we assume that the Legislature has incorporated the CCDBGA, that fact would not mean that DHHS, in adopting 392 Neb. Admin. Code, ch. 3, § 004.01D, violated the principle of separation of powers. Therefore, we reject the appellants' first assignment of error.

## 2. DUE PROCESS

DHHS' regulations require written notice from caseworkers to clients when a provided service is to be reduced or eliminated. 392 Neb. Admin. Code, ch. 4, § 002.03 (2002) (effective June 17, 2002). The notice must include a statement of what action the worker intends to take, the reasons for the intended action, and the corresponding manual reference. *Id.* The caseworker must send the notice 10 calendar days before the adverse action is effective. 392 Neb. Admin. Code, ch. 4, § 002.03A (2002) (effective June 17, 2002). If the client files a notice within 10 days after the date the notice was mailed, then the services cannot be reduced or eliminated until "a fair hearing decision is made." 392 Neb. Admin. Code, ch. 4, § 002.03D (2002) (effective June 17, 2002).

Johnsen was sent a notice on June 15, 2002, informing her that on July 1, the benefits she was receiving under the Child Care Subsidy Program would be terminated because of the adoption of 392 Neb. Admin. Code, ch. 3, § 004.01D. When notice was sent, § 004.01D had been signed by the Governor and was on file with the Secretary of State. But it had only been on file with the Secretary of State since June 12, i.e., for 3 days. Under Neb. Rev. Stat. § 84-906 (Reissue 1999), "[n]o rule or regulation of any agency shall be valid as against any person until five days after such rule or regulation has been filed with the Secretary of State." Consequently, when Johnsen's caseworker mailed her the termination-of-benefits notice, § 004.01D was not yet effective.

Johnsen argues that because 392 Neb. Admin. Code, ch. 3, § 004.01D, was not effective when the notice was sent, the notice was a nullity. She claims that § 004.01D could not be enforced against her or similarly situated members of the class until they received another notice sent after the effective date of the regulation.

We also note that Koch claims that she, too, was sent a premature termination-of-benefits notice. However, during the proceedings before the district court, DHHS conceded that the notice that it had originally sent to Koch had not contained information required by DHHS regulations. DHHS agreed to send Koch and those in a similar situation a new notice and provide them with an additional month of benefits. These new notices would have been sent well after 392 Neb. Admin. Code, ch. 3, § 004.01D, had been on file with the Secretary of State for 5 days, and thus, the appellants' second assignment of error concerns only Johnsen and those whose situation mirrored hers.

Johnsen relies on our decision in *Gausman v. Department of Motor Vehicles*, 246 Neb. 677, 522 N.W.2d 417 (1994). In that case, Russell Gausman's driver's license was automatically revoked after he was arrested for driving under the influence of alcohol. Gausman appealed, and a revocation hearing was held by the Department of Motor Vehicles (DMV). The DMV had not filed with the Secretary of State its rules governing practice and procedure for contested license revocations either at the time of the arrest or at the time of the hearing. So, under § 84-906, those rules were not valid. We concluded that because the rules used to govern the revocation hearing were not valid at the time of the hearing, Gausman had been denied due process. We rejected the DMV's argument that due process had been satisfied because Gausman had been given notice of his hearing and of the procedures that the DMV used in the revocation proceedings.

This case, however, presents a factual situation different than that presented by *Gausman, supra*. Gausman had his driver's license revoked and his appeal of that revocation heard before the rules and procedures governing license revocations were in place. The situation in *Gausman* was similar to the State's trying and convicting a person for a crime under criminal procedure rules proposed but not yet enacted by the Legislature. Under such

circumstances, the risk of abuse is obvious and prejudice will be assumed.

In contrast to Gausman, who lost his license before any rules or procedures were in place, Johnsen did not lose her childcare benefits before 392 Neb. Admin. Code, ch. 3, § 004.01D, became effective. Rather, Johnsen's benefits ended on July 1, 2002, 13 days after § 004.01D became effective. Further, nothing in the record indicates that Johnsen was harmed by her caseworker's sending the notice before § 004.01D went into effect. Moreover, unlike *Gausman, supra*, it is not clear to us how the premature notice could have possibly harmed her. In fact, it benefited her. The loss of her childcare benefit undoubtedly created a financial crisis for Johnsen. The premature notice meant that she had a few extra days to secure alternative childcare arrangements. In short, the State gave Johnsen more process than was due to her, not less, and therefore, its conduct was not unconstitutional.

## V. CONCLUSION

We are not persuaded by the appellants' argument that DHHS violated the principle of separation of powers by adopting an income eligibility rule for the Child Care Subsidy Program that conflicted with an income eligibility rule set by the Legislature. We also reject Johnsen's argument that DHHS violated her due process rights by sending her a termination-of-benefits notice before the operative date of 392 Neb. Admin. Code, ch. 3, § 004.01D.

AFFIRMED.